492 P.2d 412

John Carl KECK et al., Appellants,

v.

Robert A. KELLEY, Appellee.

No. I CA–CIV 1353.

Court of Appeals of Arizona,
Division 1,
Department A.

Jan. 11, 1972.

Rehearing Denied Feb. 9, 1972.

Review Denied April 11, 1972.

**164**

———◆———

Jennings, Strouss & Salmon, by John S. Hobbs and Jon L. Kyl, Phoenix, for appellants.

Langerman, Begam & Lewis, by Samuel Langerman and Kenneth P. Clancy, Phoenix, for appellee.

STEVENS, Presiding Judge.

The motor vehicle accident which gave rise to the Superior Court trial and to this appeal occurred on Interstate 10 in the State of New Mexico approximately 21 miles east of Lordsburg, New Mexico, shortly after midnight on the morning of 23 December 1966. At that point Interstate 10 was straight and level. It was a divided highway. Westbound traffic utilized the north portion of the highway. From south to north of the north or westbound traffic portion of the divided highway there was a 4-foot improved shoulder; then two driving lanes, each 12' wide which lanes were separated by a broken white line; and then an emergency parking area at the extreme north part of the pavement. The emergency parking area was approximately 10' 4" wide, and was separated from the north driving lane by a solid white line. North of the emergency parking lane there was a wide borrow pit between the paved highway and the north fence line of the right-of-way. The footage of drop and the angle of drop from the north paved edge of the emergency lane to the level portion of the borrow pit was sharply in dispute and is not clear from the record.

Robert A. Kelley and Edward L. Hardy were injured. They are residents of California. Together as plaintiffs they filed their suit to recover damages, the action having been filed in the Superior Court for Maricopa County, Arizona, on 20 December 1968. The defendants were John Carl Keck and Charles Snyder along with their wives. The defendants were residents of Arizona. Keck and Snyder were partners.

At the time in question, the equipment which was involved in the accident in which Kelley and Hardy were injured was being moved in furtherance of the Keck and Snyder partnership business. The procedural aspects of the trial which commenced on 29 October 1969 were governed by Arizona law and the substantive rights of the parties were governed by New Mexico law.

Hardy recovered a judgment in the sum of $100,000.00 which was settled and a release was given on 11 February 1970. The issues as to Hardy are now moot and we limit ourselves to the claim of Kelley. Kelley recovered a judgment for $37,500.00. The amount of the judgment is not questioned on appeal but it is urged that there were errors in the trial court which require a reversal of the judgment which now stands in Kelley's favor. Since the perfecting of the appeal Snyder has died and the appeal has been carried forward.

At the time of the accident Kelley and Hardy were both employees of the Consolidated Copperstate Lines. At the time in question they were engaged in driving over Interstate 10 from El Paso, Texas, to their destination in California. Their equipment was a tractor and a semitrailer which was fitted with a sleeping compartment. Kelley started the trip as the driver and Hardy went to sleep soon after leaving El Paso. Hardy was not aware of the happenings of the evening until he was awakened by the accident. The defendants urged and now urge that Kelley was negligent. The question as to whether the defense of Kelley's alleged contributory negligence could be urged in relation to the Hardy claim is now moot.

Snyder was driving a tractor and a flatbed semitrailer loaded with farm equipment from Herne, Texas to Chandler, Arizona. The flatbed trailer was 8' wide. Some days prior to the accident in question and in the vicinity of Anthony, New Mexico, also on Interstate 10, Snyder experienced motor trouble. He was able to maneuver his equipment onto the emergency parking lane

and the loaded semitrailer was left in the emergency parking lane for several days while the tractor motor was being repaired. After the motor repair, Snyder again attached the tractor to the parked semitrailer and proceeded through Deming, New Mexico, toward Lordsburg, New Mexico, en route to Chandler, Arizona. About mid-afternoon on 15 December 1966, his motor again experienced serious mechanical difficulties. Snyder estimated that his speed at the time of this occurrence was approximately 45 to 50 miles per hour and the posted speed limit was 70 miles per hour. Upon experiencing the motor trouble, Snyder promptly disengaged the clutch and coasted onto the emergency parking area, this being the location of the accident now in question. There is a sharp dispute as to the exact location of the trailer bed and the trailer wheels in relation to the solid white line which divided the northerly 12-foot driving lane from the emergency parking lane.

After Snyder had checked his equipment he hitchhiked to a place where he could secure accommodations. Arrangements were made with the garage in Anthony where the tractor had recently been repaired, these arrangements being to tow the tractor to Anthony for further repair. During the morning of the 16th he returned to his parked equipment and found that the wrecker had arrived before him.

Snyder did not check to see whether the red reflectors which he testified he had placed to the rear of the disabled equipment were still in place. His testimony as to the placing of the red reflectors was the only testimony to the effect that red reflectors had been put in place after the equipment had become disabled on the afternoon of the 15th. The evidence was without dispute that, while the tractor and semitrailer were attached to each other, it would have been a simple matter to tow them further toward the north edge of the emergency parking lane or to some location off the emergency parking lane other than onto the borrow pit area. There was a conflict in the evidence as to whether the Snyder tractor with the semitrailer attached could have angled off onto the borrow pit area without tipping. On the morning of the 16th the wrecker was attached to the tractor, the landing gear of the semitrailer was lowered and the fifth wheel was disengaged. The tractor was then towed to Anthony. The semitrailer with the landing gear down would have been difficult to move. The evidence indicates that the loaded semitrailer remained without being moved until the accident in question.

Snyder did not notify any New Mexico law enforcement official as to the location of the disabled semitrailer. Shortly after the loaded semitrailer was left on the emergency parking lane at least two Greyhound bus drivers experienced near misses and notified New Mexico law enforcement officials that the semitrailer was a hazard. Kelley had no knowledge of the fact of the location of the parked semitrailer.

Prior to the filing of the personal injury suit now in question a suit had been filed in Maricopa County seeking recovery for the property damage sustained by the semitrailer and the farm equipment. At one stage of the proceedings the property action and the personal injury action were consolidated. Later they were severed and the two complaints remained severed at the time of the trial in question. The defendants urge error in the severance. The complaint in the property damage action is not before us nor is the record clear as to the basis upon which the severance was granted. In our opinion the record before us does not enable us to rule upon this contention.

The exact location of the semitrailer was in sharp dispute. There was also a dispute as to whether any portion of the equipment which Kelley was driving was above or to the north of the solid line. Just prior to the impact Kelley was driving at the extreme north edge of the north traffic lane to enable a car and trailer to pass him. He was driving well within the speed limit in a westerly direction. Moments after the car and trailer had passed him, he saw the vague outline of the loaded, parked semi-

trailer. He tried to take evasive action, and he believed that he had been successful when the crash occurred. The exact point of impact on the Kelley equipment was not established. After the impact, the Kelley vehicle crossed the south driving lane for westbound traffic, turned over and came to rest facing easterly.

## NEED THE PLAINTIFF ALLEGE GROSS AND WANTON NEGLIGENCE?

■■■ The personal injury complaint alleged negligence and did not allege gross or wanton negligence. The answer set up the defense of contributory negligence which in New Mexico may be established as a matter of law (See Fitzgerald v. Valdez, *77 N.M. 769, 427 P.2d 655 (1967)*), rather than always being a question of fact as under Arizona's Constitution. See Art. 18, § 5, A.R.S. Apparently shortly before the trial the attorney for the plaintiffs informed the attorney for the defendants that without alleging new facts the plaintiffs would seek to amend their complaint to allege that the defendants were guilty of gross and wanton negligence. Such a motion was made on the day of the trial and resisted. The trial judge declined to grant the motion and advised counsel that at the time of the settling of the instructions he would review the evidence and then decide whether it was proper to instruct on gross or wanton negligence. We find no error in this ruling. In our opinion a plaintiff need not allege gross and wanton negligence in order to avail himself of its use, if present under the evidence, to offset the defense of contributory negligence. We recognize that complaints in personal injury actions at times allege that the defendant was guilty of gross and wanton negligence. The presence of gross and wanton negligence may counter the effectiveness of the defense of contributory negligence. Rule 8(d) of the Rules of Civil Procedure, 16 A.R.S., requires that the defense of contributory negligence be affirmatively plead. We do not find in Rule 8(d) or in Rule 8(e) that there need be a response to the defense of con-

tributory negligence. A complaint need not anticipate an affirmative defense. Bohmfalk v. Vaughan, 89 Ariz. 33, 357 P.2d 617 (1960). Here the defendants were adequately forewarned. The plaintiffs did not move to amend their complaint at the close of the evidence as authorized by Rule 15 (b). We find no procedural deterrent to instructions on gross or wanton negligence.

## THE JURY ARGUMENT AS TO GROSS OR WANTON NEGLIGENCE

■■ At the conclusion of the evidence the trial court, at the request of the plaintiffs and over the objection of the defendants, approved the giving of instructions on gross and wanton negligence. In the opening argument the plaintiffs discussed their theory of Snyder's negligence and they did not urge that Snyder's negligence constituted gross and wanton negligence. The answering argument of the defendants urged the defense of the absence of negligence on the part of Snyder as well as the defense of contributory negligence as to Kelley, the trial court having ruled as a matter of law that the defense was not available as to Hardy. The plaintiffs' closing argument included references to the gross or wanton negligence instructions and the argument characterized Snyder's acts and omissions as gross or wanton. In the argument it was urged that the effect thereof, if found to be present, had the effect of negating the defense of contributory negligence in accordance with instructions which the trial court had theretofore approved. Timely and vigorous objections were presented to this portion of the closing argument. The trial court observed that the plaintiffs' argument was proper rebuttal to the defendants' argument urging the defense of contributory negligence. We agree. We agree that it was proper to instruct on gross or wanton negligence where the immediate emergency had passed and a reasonable opportunity had become available to move the disabled equipment to a safer location. The jury had the right to decide whether the acts or

omissions of Snyder, to quote the court's instruction,

"* * * would lead [Snyder as] a reasonable man to realize that the actors' conduct not only creates an unreasonable risk of bodily harm to the other, but also involves a high degree of probability that substantial harm will result to him."

## NEW MEXICO ACCIDENT REPORT

The chief witness for the defendants was Officer Joe Rutland, a 17-year veteran of the New Mexico State Police. Officer Rutland investigated the accident, interviewed the injured plaintiffs in the hospital following the accident and then prepared his report on the 26th day of December. He testified that official reports of accidents are required and are filed in Santa Fe, New Mexico. He had a copy of his report with him which he used to refresh his memory while he was testifying. The plaintiffs offered no objection to this use of the report. It is not clear from the record whether the copy to which Officer Rutland referred was his retained copy or was a copy certified by the official custodian of the report. The report was not marked for identification. The report is not before this Court. The defendants offered the report in evidence and the trial court sustained the objections thereto, by stating out of the presence of the jury that Officer Rutland had been present and testified. The defendants urge that under the case of State v. Stone, 104 Ariz. 339, 452 P.2d 513 (1969), the report was admissible

in evidence. This case was briefly discussed in Rodriguez v. Williams, Ariz., 489 P.2d 268 (1971). Not having the report before us and not being advised as to the New Mexico law in reference to filing and certifying we are unable to pass upon the correctness of the ruling of the trial court. We do not speculate as to whether portions of the report may have been subject to objections by the plaintiffs had the trial court ruled that the report was admissible as an official record of the State of New Mexico.

## IMPEACHMENT

There were some inconsistencies in Officer Rutland's testimony. The plaintiffs urge that after the accident he had been criticized for not causing the semitrailer to be moved.[1] The plaintiffs urge that by reason of this criticism he was defensive and was not an unbiased investigating officer. On cross-examination Officer Rutland was asked:

"Q And you got criticized for that after the accident was over, didn't you, sir?

The defendants' objection to the question was sustained. Thereafter there was a reported conference between court and counsel. (At this point this Court desires to commend the trial court for its foresight in having bench conferences and in-chambers conferences reported. The reporting of these vital portions of the trial are a great aid at the appellate level.) The bench conference disclosed that it was the theory of the plaintiff that by being per-

---

1. New Mexico Statutes 1953, § 64–18–50

"64–18–50. Officers authorized to remove illegally stopped vehicles.—

\* \* \* \* \*

"(c) No driver of any vehicle shall permit said vehicle to remain unattended on or adjacent to any public road, highway, or highway right of way of the state for a longer period than 24 hours without notifying the state police or sheriff's office of the county where said vehicle is parked or said vehicle shall be deemed abandoned. The state police or sheriff's officer may cause all such abandoned vehicles to be removed and the owner of

the vehicle shall be required to pay all costs incident to the removal of said vehicle, Provided that wrecked vehicles may be removed at any time and without regard to the 24 hour period hereinbefore provided.

"(d) Whenever an officer shall order a dealer or wrecker to remove from a highway, or territory adjacent thereto, any damaged or abandoned vehicle the officer shall at the time issue signed and dated instructions in writing to the dealer or wrecker specifically stating if the vehicle is to be 'held for investigation' or if it may be released to the owner."

mitted to show after-accident criticism the plaintiffs could show bias. Plaintiffs' counsel, in an in-chambers conference, advised the trial court, in part, as follows:

"MR. LANGERMAN: The purpose of our going into this subject, your Honor, was to establish that this highway patrolman, whether rightly or wrongly, whether with merit or without merit, was believed by some people after the accident to have been at least partly to blame for what occurred, and that there was conference and discussion or comments or rumors after the accident to the effect that he should have removed the trailer when he received the warnings to the effect that the trailer was a hazard. In this connection Mr. Rutland himself has already admitted that he told Mr. Hardy that he should have removed it. And we want to merely bring this point out in somewhat more detail, that as of the day before, the day after the accident, already this man was at that time being, in some way, blamed by people, and that this was prior to the time that he filled out his police report, which was filled out on December 26th, it was prior to the time that he was ever deposed, and that unlike usual highway patrolmen, this is a highway patrolmen (sic) who looks less to blame if the trailer wasn't in the way, he looks less to blame for not removing it. And that consciously or unconsciously, he has tended toward putting that trailer as far off the shoulder as he can to show that he shouldn't have moved it, he wasn't too much to blame.

"Now, the significant point, your Honor, is not whether the people who started this rumor were right or wrong, it isn't whether he should or shouldn't have moved it, it is the fact that he was subject to criticism, and he thus got himself involved as somebody in this case."

The trial court ruled in the plaintiffs' favor.

The cross-examination of Officer Rutland as to this matter discloses the following:

"Q But this one accident was unique, wasn't it, because after it was over there was, indeed, some discussions as to whether you could have done something to have prevented it, wasn't there, sir?

"A Not that I know anything about."

With reference to the officer's conference with Hardy, in the hospital after the accident and before he made his official report, we find that Officer Rutland was questioned as follows:

"Q And, as a matter of fact, that is why you discussed that subject with Mr. Hardy in the hospital, isn't it, sir?

"A Discussed what subject?

"Q The subject of why you didn't move the trailer yourself.

"A No, sir, I don't think so.

"Q You did discuss the subject with him, and told him that you should have moved it, but I think you added but you didn't have the equipment, is that what you told him?

"A That is probably correct, yes, sir.

"Q And the way that subject came up as to whether you should have moved it, or not, is there was (sic) a discussion of why wasn't it moved when it was reported, isn't that true, sir?

"A I don't remember it, no, sir.

"Q Well, are you denying that that happened, sir, or have you just—

"A No, sir, I am not denying it, I don't remember it if it come (sic) up that way.

"Q And is it then correct that you just don't remember whether anybody at that time in the next day or two was asking you why you didn't remove the thing, you don't remember anybody asking—

"A No, sir, there was no one.

"Q You don't remember whether they did or didn't?

"A I don't remember anyone asking me why it wasn't."

The only evidence in support of after-accident criticism which is supposed to have affected Officer Rutland's objectivity is

found in the subsequent examination of Hardy.

"Q Just did he tell you whether others had talked to him about this?

"A He said that he had had some complaints."

The trial court, on objection by the defendants struck the above answer and instructed the jury to disregard it. Thereafter the questioning of Hardy by his counsel proceeded as follows:

"Q The first question to you is, did he say something to you about whether other people were, had talked to him about his failure to remove that trailer? Just yes or no.

"A. Yes.

＊　＊　＊　＊　＊　＊

"Q Go ahead and answer the question. Mr. Hardy.

"A He said that there was (sic) some complaints called in that the thing was setting too close to the road, or hazardous, I don't remember the exact words the man used, but something of that nature.

"Q And did he explain to you why he hadn't removed it, sir?

"A No."

In the opening argument plaintiffs' counsel urged that Officer Rutland was the first officer he had examined who was not unbiased. He added:

"But in Mr. Rutland's case that wasn't so, ＊　＊　＊."

Further in the argument it was asserted, and the record reflects the fact, that *before* the accident Officer Rutland had received reports that the semitrailer in its then position adjacent to the white line was a traffic hazard. We quote further:

"And he knows now, whether he then knew or not, he knew as soon as the accident occurred that he had goofed in

not moving it. He knew that. And he knew it not only because the accident happened, but because there were comments about it."

We find no basis in the evidence for the argument that after the accident, "there were comments about" Officer Rutland's failure to have the semitrailer moved or that Officer Rutland knew of these after-the-accident criticisms.

■ There was no foundation laid as to the time, place and persons relating to the prospective testimony as to criticism. We find no admissions by Officer Rutland that he was aware of after-the-accident criticisms. The prospective testimony as to the supposed criticism of Officer Rutland following the accident did not materialize. It was error to permit the pursuit of this line of questioning.

## DRIVING IN THE EMERGENCY AREA

■ Donald H. Martin, a professional truck driver familiar with the road in question, was called as a witness for the plaintiffs. On cross-examination, and without objection, Martin gave the following testimony.

"Q BY MR. HOBBS: So far as you know, Mr. Martin, does the [New Mexico] State law to which you are referring allow you to drive on these improved shoulders or emergency parking lanes?

"A They don't, no.

"Q You are supposed to stay on the travel portion of the road, is that correct?

"A Yes."

Officer Rutland gave the following testimony:

"Q Are there any signs on this highway between Deming and the place where the accident happened, traffic control signs I am talking about, not advertisements, that relate to driving on the shoulder?

"A Yes, sir.

"Q That was an improper question, I should have asked you at the time of this accident were there any such signs?

"A Yes, sir.

"Q And would you tell the jury, number one, how many signs there were between, say Deming and the place of the accident, relating to driving on the shoulder?

"A Really, I don't know how many there were, but I would say two.

"Q And what is the distance between Deming and the place where the accident happened?

"A Approximately 40 miles.

"Q What did these signs say, sir?

"A 'Do not drive on shoulder.'

"Q What is that again, sir?

"A 'Do not drive on the shoulder.'

"Q And where were they placed with relation to the improved shoulder?

"A They would be off of the improved shoulder in the north bar ditch."

There are New Mexico statutes relating to highway signs. These were quoted in full in the defendants' requested Instruction No. 9 as follows:

"DEFENDANTS' REQUESTED INSTRUCTION NO. 9

"64–16–2. State highway commission to sign all state highways.—(a) The state highway commission shall place and maintain such traffic-control devices, conforming to its manual and specifications, upon all state highways as it shall deem necessary to indicate and to carry out the provisions of this act or to regulate, warn, or guide traffic.

"(b) No local authority shall place or maintain any traffic-control device upon any highway under the jurisdiction of the state highway commission except by the latter's permission.
"*New Mexico Statutes 1953 Annotated*, § 64–16–2.

"64–16–4. Obedience to and required traffic-control devices.—(a) The driver of any vehicle shall obey the instructions of any official traffic-control device applicable thereto placed in accordance with the provisions of this act, unless otherwise directed by a traffic or police officer, subject to the exceptions granted the driver of an authorized emergency vehicle in this act.

"(b) No provision of this act for which signs are required shall be enforced against an alleged violater if at the time and place of the alleged violation an official sign is not in proper position and sufficiently legible to be seen by an ordinarily observant person. Whenever a particular section does not state that signs are required, such section shall be effective even though no signs are erected or in place.

"*New Mexico Statutes 1953 Annotated*, § 64–16–4."

The plaintiffs objected thereto urging that these statutes were not so ordered as to render their violation an act of negligence. The plaintiffs urge that the foundation as to the erection, location and visibility of the signs from the highway was insufficient. The defendants countered that from their view of the evidence Kelley was driving on the shoulder in violation of the admonition of the signs concerning which Officer Rutland had testified. There was a conflict in the evidence as to the exact location of the semitrailer and as to the position of the Kelley vehicle at the time of the impact. Whether a slight encroachment of the Kelley vehicle on the emergency driving lane constituted "a driving" thereon is not defined. We are not informed that the defendants' requested Instruction No. 9 was a uniform New Mexico instruction. We hold that the defendants had sufficient evidence in the record to warrant a giving of the requested instruction on their theory of the case.

## THE GROSS OR WANTON INSTRUCTION

■ Earlier in this opinion we quoted a portion of the instruction which was given

relative to the definition of gross and wanton negligence. This language was taken from the Arizona Uniform Instructions—Automobile Negligence Series, a series of unofficial jury instructions recommended by a committee of the State Bar of Arizona and used extensively. The defendants objected to the instruction in part for the reason that the instruction was not one of the New Mexico Uniform Jury Instructions. The defendants did not advise the trial court as to the wording of the New Mexico Uniform Instruction. We recognize that in New Mexico the Uniform Instructions have a very high standing and it is possible that had this cause been tried in New Mexico the failure to use the New Mexico Uniform Instruction, if there was a failure, could have been reversible error. See Clinard v. Southern Pacific Company, 82 N.M. 55, 475 P.2d 321 (1970) and Jewell v. Seidenberg, 82 N.M. 120, 477 P.2d 296 (1970).

Notwithstanding the fact that the New Mexico substantive law governs this case, it is our opinion that we should review this case and the errors above urged in the light of Arizona's constitutional provisions. Art. 6, § 27 provides in part:

"No cause shall be reversed for technical error in pleadings or proceedings when upon the whole case it shall appear that substantial justice has been done."

In our opinion the most serious problem facing this Court was the error in permitting the cross-examination of Officer Rutland relative to the asserted post-accident criticism of his failure to cause the semi-trailer to be moved, a criticism which the evidence did not develop as being a fact.

We recognize that there are other issues which have been raised which we have not covered in this opinion.

From overall study of the record it appears to us that " * * * upon the whole case * * * substantial justice has been done."

Affirmed.

CASE and DONOFRIO, JJ., concur.